UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| DISEIYE IYEBOTE, M.D., | ) |
| Plaintiff, | ) |
| v. | ) No. 3:20-cv-00475 |
| MEHARRY MEDICAL COLLEGE, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

During the final year of her medical school residency program, Dr. Diseiye Iyebote ("Iyebote") believes she experienced mistreatment by co-workers and managers at Meharry Medical College ("Meharry"). She alleges violations under the Tennessee Human Rights Act ("THRA"), T.C.A. § 4-21-101 *et seq.*, and the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.* Meharry seeks dismissal of all of her claims. (Doc. No. 27). Except for Iyebote's claim for disability discrimination under the THRA, however, a jury will need to decide whether her alleged mistreatment was illegal.

## I. UNDISPUTED MATERIAL FACTS

The parties' responses to the Undisputed Statement of Facts (Doc. Nos. 35 and 39) crystalize the critical facts of Iyebote's sexual harassment, retaliation, and disability claims, as discussed below.

Iyebote identifies two episodes of sexual harassment between April 2018 and April 2019 that marred her residency experience in Meharry's Department of Psychiatry and Behavior Sciences. (Doc. No. 35 ¶¶ 13, 42; see also Doc. No. 39 ¶ 78).

April 2018–June 2018

In April 2018, Dr. Mina Ossei, Iyebote's fellow Meharry resident, falsely spread rumors that Iyebote was sexually involved with three attending physicians in the Internal Medicine Department at the Veteran's Affairs Hospital ("VA"). (Doc. No. 35 ¶¶ 1, 16; see also Doc. No. 39 ¶ 58). In May and June 2018, Meharry assigned Iyebote to complete a rotation in the same department where the three attending physicians worked. (Doc. No. 35 ¶ 16). This assignment proved too much for Iyebote, who was absent for ten days of the rotation. (Doc. No. 39 ¶ 82; see also Doc. No. 35 ¶¶ 17).

August 2018–March 2019

Beginning in August 2018, Associate Chief Resident Dr. Paschal Ike began making sexually inappropriate statements toward and about Iyebote. (Doc. No. 35 ¶ 22). For example, Ike often said to Iyebote: "damn girl, you look good," "you are fine," "I would [wife] you up, I don't need to date you," and "you're beautiful." (Id. ¶¶ 22–23). On other occasions, Ike asked Iyebote to marry him, asked whether she found him attractive, and told her that he was "horny." (Id. ¶ 24). On October 26, 2018, Iyebote says that Ike entered a room with her, closed the door, exposed his genitals, and suggested that she perform oral sex. (Id.; see also Doc. No. 39 ¶ 71). And, on at least one occasion, Iyebote says that Ike touched her in a sexually inappropriate manner. (Doc. No. 36 at 6). On still yet another occasion, while Iyebote worked an overnight hospital shift, Ike, who was not scheduled to work, showed up unannounced. (Doc. No. 39 ¶ 84). He entered the resident call room when Iyebote was alone and stole her laptop. (Doc. No. 35 ¶ 28). The incident terrified Iyebote, and she no longer felt safe at Meharry. (Doc. No. 39 ¶¶ 84, 86).

2

Iyebote's Complaints about Sexual Harassment

Under Meharry's sexual harassment policy, "[i]f any employee witnesses or experiences any form of harassment or violence he or she should immediately contact and report the incident to a supervisor, the Human Resources Department, Legal Counsel and/or the Director of Corporate Compliance." (Doc. No. 35 ¶¶ 9–12). The policy also requires any supervisory employee who learns about alleged sexual harassment to report it to Human Resources ("HR"). (Doc. No. 39 ¶ 65).

On April 20, 2018, Iyebote complained to Dr. Lloyda Williamson, chair of Meharry's Psychiatry Department about Ossei spreading rumors that Iyebote was engaged in sexual trysts with VA doctors. (Doc. No. 35 ¶¶ 1, 26; see also Doc. No. 39 ¶ 72). But Williamson encouraged her to not pursue the issue with HR because Iyebote needed to be more "thick-skinned," to "move past it," and to "drop" it. (Doc. No. 39 ¶ 61). Iyebote acquiesced. She sent Williamson an email that she would not press the issue further. (Id.). Specifically, she wrote to Williamson that she "decided to move on with [her] life," planned to "focus on her board exams," and would "put [her] best foot forward to work with and maintain a healthy work relationship with all parties involved." (Doc. No. 37-15). After her email, Iyebote again complained to Williamson about Ossei's rumors without adding anything new about those rumors. At no time did Williamson escalate Iyebote's complaint to HR.

Starting in October 2018, Iyebote complained to Williamson about Ike's sexual harassment. (Doc. No. 35 ¶ 26; see also Doc. No. 39 ¶ 72). She also complained about Ike to Dr. Richmond Akatue, Meharry's Associate Dean of Graduate Medical Education, fellow resident Dr. Karlos Parham, and to physician colleagues Dr. Appleton and Dr. Farhan Adam. (Doc. No. 39 ¶¶ 56, 64; see also Doc. No. 35 ¶ 26). Yet, no one followed Meharry's policy to report it to HR. (Doc.

3

No. 39 ¶ 64). After Iyebote's complaints, Williamson attempted to discipline and terminate Iyebote. (Id. ¶ 81). This incident led to a meeting with Iyebote, Williamson, and others, (id. ¶ 82), during which some Meharry officials expressed concerns about the trauma Iyebote had endured due to Ike. Williamson still did not engage with HR. (Id.).

Iyebote believes she was subjected to a pattern of retaliation when Williamson assigned her more holiday calls than her fellow residents and placed her on back-to-back 24-hour shifts. (Id. ¶ 78; see also Doc. No. 35 ¶ 29). She reported her retaliation complaints to Williamson, who took no action. (Doc. No. 39 ¶ 39).

Iyebote Takes FMLA Leave and Alleges Additional Retaliatory Conduct

In March 2019, Iyebote was diagnosed with depression, anxiety, and post traumatic stress disorder. (Id. ¶ 86). She then requested and received several weeks of FMLA leave. (Id.; see also Doc. No. 35 ¶ 37). Upon her return, she requested a reduced work schedule of no more than six hours per day, five days per week; however, Williamson denied the request because the residency program could not accommodate it. (Doc. No. 35 ¶¶ 38–39). On April 3, 2019, Iyebote's first day back from FMLA leave, she was placed on a 24-hour shift by Williamson. (Doc. No. 39 ¶ 90). That same day, Williamson disciplined her for tardiness that occurred two months earlier in January 2019. (Id. ¶ 92). Williamson also emailed a Meharry official to complain about issues related to Iyebote's work performance even though Iyebote had only recently returned from FMLA leave. (Id. ¶ 95).

April and May 2019 Williamson Terminates Iyebote

On April 29, 2019, Williamson terminated Iyebote from Meharry's psychiatry residency program. (Doc. No. 35 ¶ 42). The parties dispute her reasons for dismissal. (Id. ¶ 44). Williamson initially claimed there were several issues with Iyebote's professionalism and that she put a patient

4

Case 3:20-cv-00475   Document 42   Filed 02/18/22   Page 4 of 18 PageID #: 929

in harm's way when she incorrectly completed a 6404[1] form. (Id. ¶¶ 43-44). Iyebote contends that she correctly cared for the patient, and she believes that her termination was retaliation for her complaints. (Id. ¶ 44). Some Meharry officials tend to agree with Iyebote, including Dr. Akatue, who felt that Iyebote should not have been terminated based on mishandling the 6404 form. (Doc. No. 39 ¶ 98).

On May 7, 2019, Iyebote appealed the termination decision to the Meharry Graduate Medical Education Board (the "Board"). The Board upheld Williamson's decision but recommended that Iyebote be allowed to complete her internal medicine rotation. (Doc. No. 35 ¶ 49; see also Doc. No. 39 ¶ 99). Williamson overruled the Board's recommendation and terminated Iyebote from Meharry's residency program. (Doc. No. 39 ¶ 99).

## II. LEGAL STANDARD

Summary judgment is appropriate only where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Griffith v. Franklin Cty., 975 F.3d 554, 566 (6th Cir. 2020) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003) (citation omitted). "The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the non-moving party's case." Id. (citation and internal quotation marks omitted).

---

[1] A 6404 form is another name for paperwork that must be completed when a physician commits a patient to the hospital involuntarily.

5

In deciding a motion for summary judgment, the Court must review all the evidence, facts, and inferences in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted). The Court does not, however, weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. Anderson, 477 U.S. at 249. The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather, there must be evidence on which a trier of fact could reasonably find for the non-moving party. Rodgers, 344 F.3d at 595.

## III. ANALYSIS

Meharry seeks summary judgment on Iyebote's claims under the THRA for sexual harassment, retaliation, and disability discrimination, as well as her two claims under the FMLA for interference and retaliation. As an initial matter, the Court will dismiss Iyebote's claim for disability discrimination because the THRA does not prohibit disability discrimination. See Sasser v. ABF Freight Sys., 219 F. Supp. 3d 701, 708 (M.D. Tenn. 2016) ("[I]t is well settled that the THRA does not provide a remedy for discrimination on the basis of disability.") (citation omitted).

### A. Sexual Harassment Under the THRA

Like its federal counterpart, the THRA prohibits maintaining a hostile work environment based on sexual harassment. See Bailey v. USF Holland, Inc., 526 F.3d 880, 885 n.1 (6th Cir. 2008); see also Sneed v. City of Red Bank, 459 S.W.3d 17, 26 (Tenn. 2014) (noting that the THRA was "intended to be coextensive with federal law"); Campbell v. Fla. Steel Corp., 919 S.W.2d 26, 31 (Tenn. 1996) (applying Title VII standard to THRA sexual harassment claims); Ferguson v. Middle Tenn. State Univ., 451 S.W.3d 375, 381 (Tenn. 2014) (same).

To establish a prima facie hostile work environment claim based upon sex, an employee must show that: "she was a member of a protected class; (2) she was subjected to unwelcome

harassment; (3) the harassment was based on sex; (4) the harassment created a hostile work environment; and (5) employer liability." Wyatt v. Nissan N. Am., Inc., 999 F.3d 400, 411 (6th Cir. 2021); see also Randolph v. Ohio Dep't of Youth Servs., 453 F.3d 724, 733 (6th Cir. 2003) (citations omitted). The parties dispute only the last two elements.

   1. *Hostile Work Environment*

Iyebote argues that she was subjected to a hostile work environment based upon her sex due to: (1) Dr. Ossei's rumors that Iyebote was having a sexual relationship with three attending physicians, (Doc. No. 35 ¶¶ 1, 16; see also Doc. No. 39 ¶ 58), and (2) Ike's comments and behavior towards her. (Doc. No. 35 ¶¶ 22–24). A hostile work environment arises when "'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Nathan v. Great Lakes Water Auth., 992 F.3d 557, 564–65 (6th Cir. 2021) (quoting Oncale v. Sundowner Offshore Servs., 523 U.S. 75, 78 (1998)); see also Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). "[W]hen analyzing whether a plaintiff has alleged the existence of a hostile work environment," courts must examine the "totality of the circumstances." Williams v General Motors Corp., 187 F.3d 553, 562 (6th Cir. 1999). This requires both an objective and a subjective analysis. Nathan, 992 F.3d at 567–68.

An objectively hostile work environment exists where a reasonable person would find an environment hostile or abusive. Harris, 510 U.S. at 21. Courts consider a number of factors in analyzing whether a work environment is objectively hostile, including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 23. Conduct is more likely to be objectively hostile where it is "continuous

7

and not sporadic." Wyatt, 999 F.3d at 411 (citing Hawkins v. Anheuser-Busch, Inc., 517 F.3d 321, 334 (6th Cir. 2008)). Conversely, a subjectively hostile work environment exists where the employee herself "subjectively perceive[d] the environment to be abusive." Id. at 411–12 (citing Harris, 510 U.S. at 21).

The rumors about Iyebote shared to others by Ossei are not objectively hostile. They were not frequent, physically threatening, or humiliating. The Sixth Circuit has consistently found that rumors, particularly those circulating only for short periods, are alone insufficient to establish a hostile work environment claim as a matter of law. See Powell-Pickett v. A.K. Steel Corp., 549 F. App'x 347, 354 (6th Cir. 2013) (managers spreading rumors that plaintiff was a hooker and calling her names constituted "sporadic mean conduct but not the severe or pervasive harassment of a hostile work environment"); Larocque v. City of Eastpointe, 245 F. App'x 531, 536 (6th Cir. 2007) ("comments based in rumor and innuendo" over two months are insufficient to establish an objectively abusive environment); Jones v. City of Allen Park, 167 F. App'x 398, 407-08 (6th Cir. 2006) (isolated rumors is the kind of "minor harassment" that is "not actionable" as a hostile work environment claim); Birone v. Indian River Sch., No. 97-3212, 1998 U.S. App. LEXIS 7603, at *10-11 (6th Cir. Apr. 15, 1998) (year-long "idle gossip about an alleged office romance" is neither long-lasting nor sufficient to sustain a hostile work environment claim); Mitchell v. Toledo Hosp., 964 F.2d 577, 584-85 (6th Cir. 1992) (rumors, conclusory allegations and subjective beliefs" are insufficient evidence to establish a hostile work environment claim).

Here, Ossei's rumors about Iyebote lasted only three months, constituted idle gossip, do not rise beyond mere offensive utterances, and are otherwise insufficient to satisfy an objective analysis. See Harris, 510 U.S. at 23. And even if the rumors were objectively hostile, they were not subjectively offensive to Iyebote. After initially discussing the rumors with Williamson,

Iyebote ultimately decided to abandon her complaint about the rumors and did not want HR to look into her concerns. (See Doc. No. 37-15). Her decision shared with Williamson was that she would move on with [her] life," "focus on [her] board exams and residency," and would "put [her] best foot forward to work with, and maintain a healthy work relationship with all parties involved to the best of [her] abilities." (Id.). There is no admissible evidence that Iyebote changed her mind after her email to Williamson. Because Iyebote dropped the issue, she did not subjectively perceive it to be offensive. Where a "victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no [THRA] violation." Harris, 510 U.S. at 21–22; see also Nijem v. Alsco, Inc., 796 F. Supp. 2d 883, 895 (M.D. Tenn. 2011). Accordingly, Ossei's rumors are not objectively or subjectively so offensive as to create a hostile work environment.

Ike's conduct and comments, on the other hand, easily survive summary judgment. His actions were frequent, physically threatening, and humiliating. When the record is viewed in the light most favorable to Iyebote, there is abundant admissible evidence from which the jury can conclude that Ike may have engaged in highly offensive, inappropriate, and distasteful sexual behavior toward Iyebote while each worked at Meharry. A few examples of his actions make this clear:

- Ike touched Iyebote's legs under the table. (Doc. No. 39 ¶¶ 70–71; Parham Dep., Doc. No. 37-11, 24:1–7);
- Ike exposed his genitals to Iyebote. (Doc. No. 35 ¶ 24);
- Ike requested oral sex from Iyebote. (Id.);
- Ike said to Iyebote: "damn girl, you look good," "you are fine," "I would [wife] you up, I don't need to date you," and "you're beautiful." (Id. ¶¶ 22–24);

9

- Ike asked Iyebote to marry him. (Id. ¶ 24); and

- Ike told Iyebote that he was "horny" while looking at her. (Id.).

Unwanted touching is one of the most offensive things that can occur in the workplace and should never be tolerated. As the Sixth Circuit has observed, uninvited physical touching "is more severe than harassing comments alone." Hawkins, 517 F.3d at 334. Based on Ike's alleged touching of Iyebote, a reasonable juror could conclude that Iyebote's work environment was objectively abusive. See Williams, 187 F.3d at 562 (finding that a physical invasion could "at a minimum . . . raise[] a question of fact for the jury"); see also Balding-Margolis v. Cleveland Arcade, 352 F. App'x 35, 43–44 (6th Cir. 2009) (finding that two instances of unwanted physical touching constituted the "most invasive conduct" and "raise[d] a question of fact as to whether [plaintiff] experienced a hostile work environment"). But here, Ike did more than touch Iyebote; he repeatedly made lewd, sexually charged overtures toward her. A reasonable juror could certainly conclude that Ike's comments, viewed alongside his alleged touching, is objectively offensive. In Hawkins v. Anheuser-Busch, Inc., for example, a female employee complained that her harasser "repeatedly made crude requests for oral sex, solicited a sexual relationship, and invaded her physical space by rubbing her, touching her, and trying to 'feel on her.'" 517 F.3d at 334. The Sixth Circuit found that this was "sufficient to survive summary judgment on the issue of whether the harassment [plaintiff] experienced was severe or pervasive." Id.

The Sixth Circuit has repeatedly rejected summary judgment on the severe or pervasive element when a harasser not only physically touches an employee, but also exposes his genitals and makes graphic, uninvited sexual advances. See Wyatt, 999 F.3d at 411 (harasser exposed his genitals, rubbed plaintiff's back, and made several, unwelcome sexual propositions); Blackmon v. Eaton Corp., 587 F. App'x 925, 930–31 (6th Cir. 2014) (supervisor "stared at [plaintiff's] breasts"

10

consistently and "paired his offensive staring with offensive physical contact"); Clark v. UPS, 400 F.3d 341, 352 (6th Cir. 2005) (sexual jokes, placing a vibrating pager on employee's thigh, and looking down the plaintiff's overalls); Hawkins, 517 F.3d at 333–34 ( "sexual comments and harassing acts of a 'continual' nature are more likely to be deemed pervasive"); Williams, 187 F.3d at 559 (harasser told employee that she could "rub up" against him anytime; approached her from behind and said "Back up: just back up"; touched her neck; and suggested that she touch his genitals); Mahar v. Meharry Medical College, No. 3:16-cv-02486, 2017 WL 6442144, at *11 (M.D. Tenn. Dec. 18, 2017) (Meharry medical school resident claimed that a colleague touched her shoulder and chest, told her that "he loved her more than a friend," and made sexual advances). If true, Ike's actions are egregious. A reasonable juror could readily conclude that they were objectively unreasonable because they are "humiliating and fundamentally offensive to any woman." Williams, 187 F.3d at 562.

It logically and reasonably follows that Iyebote found Ike's actions subjectively unreasonable. Meharry does not dispute that Iyebote became "terrified" and no longer felt safe at work due to Ike's conduct. (Doc. No. 39 ¶¶ 84, 86). Accordingly, a reasonable juror may conclude that Ike created a hostile work environment.

  2. *Employer Liability*

Likewise, the jury will need to determine whether Meharry should be held responsible for Ike's conduct. Meharry's liability for Ike's conduct is determined based on the "status of the harasser." Wyatt, 999 F.3d at 412. If the alleged harasser is a co-worker, "an employer is liable if it knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action." Clark, 400 F.3d at 438 (citing Hafford v. Seidner, 183 F.3d 506, 515 (6th Cir. 1999)). Where the harasser is a manager or supervisor, "an employer *is*

11

vicariously liable for an actionable hostile work environment." Id. (citing Jackson v. Quanex Corp., 191 F.3d 647, 663 (6th Cir. 1999) (emphasis in original)). An employee "can proceed under both" the supervisor and co-worker theories. In this case, there are genuine factual disputes about Ike's status at Meharry that preclude summary judgment. Wyatt, 999 F.3d at 412–13 (citing Vance, 570 U.S. at 443–44).

Meharry argues that Ike does not qualify as a supervisor because his role as an associate chief resident was "limited to assisting with making out the call rotation schedule." (Doc. No. 28 at 11). Meharry is correct that a supervisor is "an employee that has the power 'to take tangible employment actions against the victim, i.e., to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" Wyatt, 999 F.3d at 412–13 (citing Vance v. Ball State Univ., 570 U.S. 421, 431 (2013)). But an employer "may be held to have effectively delegated the power to take tangible employment actions to [an employee] on whose recommendations it relies." Id. (citing Vance, 570 U.S. at 447).

Iyebote has put forth sufficient admissible evidence to raise a genuine issue of fact about whether Ike had supervisory authority over her. Three Meharry officials with significant time and experience at the school aver that associate chief residents have "supervisory roles over the residents," according to Michelle Williams, the former resident coordinator in Meharry's Psychiatry Department; Dr. William Richie, former Residency Program Training Director; and attending physician Dr. Oluchukwu Oluoha. (Doc. No. 37-6 ¶ 4; see also Doc. No. 37-7 ¶ 3). Critically, Meharry has also contradicted itself during discovery, first admitting that Ike supervised Iyebote before later clarifying that neither chief residents nor associate chief residents "provide supervision." (Doc. No. 37-2 ¶ 7). But the record, when viewed in the light most favorable to

12

Iyebote, reflects a disputed issue of material fact on this issue. As Williamson's deposition testimony makes clear she met weekly with both chief residents and associate chief residents, including Ike, "to discuss [residents] concerning behaviors or performance issues." (Doc. No. 37-5 at 59:4–9). Further, Meharry does not dispute that, on at least one occasion, Ike provided information that Williamson relied upon to attempt to discipline Iyebote for tardiness in April 2019. (Doc. No. 39 ¶ 92). This admissible evidence at trial presents a genuine dispute of material fact about whether Ike had supervisory authority or other "indicia of reliance and authoritative input." Wyatt, 999 F.3d at 413 (internal citations omitted). The jury will need to decide at trial whether Ike was a supervisor or co-worker, which determines Meharry's responsibility for Ike's actions. See id. at 417.

Iyebote has also presented sufficient admissible evidence to allow the jury to decide whether Meharry is responsible for Ike's conduct under a co-worker liability theory. "For a plaintiff to hold an employer liable for the harassing conduct of an employee's co-workers, the plaintiff 'must show that the employer's response to the plaintiff's complaints 'manifest[ed] indifference or unreasonableness in light of the facts the employer knew or should have known.'" Id. (citing Waldo v. Consumers Energy Co., 726 F.3d 802, 814 (6th Cir. 2013)). Meharry does not dispute that Iyebote complained about Ike's behavior to Williamson, (Doc. No. ¶ 35 ¶ 25), Akatue and others. (Doc. No. 39 ¶ 64). Because Williamson and Akatue are Meharry supervisors over Iyebote to whom she could complain about sexual harassment, (id. ¶ 65), Meharry had notice "which obligated it to begin taking prompt and appropriate remedial measures." Wyatt, 999 F.3d at 417. Yet, neither Williamson nor Akatue reported the issue to HR as Meharry's policy requires. (Doc. No. 39 ¶¶ 60, 65). A reasonable juror could therefore conclude that Meharry failed to take prompt, reasonable, and appropriate corrective action. See Wyatt, 999 F.3d at 417. By so doing,

13

Meharry showed indifference to Iyebote's complaints. Iyebote's hostile work environment claim may proceed at trial under a co-worker liability theory.

Meharry's motion for summary judgment on Iyebote's hostile work environment claim must be denied.

B. Retaliation Under the THRA

Iyebote challenges her termination from Meharry's residency program as retaliatory. (Doc. No. 36 at 12–13). She relies upon circumstantial evidence to prove this claim, triggering the oft-cited burden shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under that framework, Iyebote must first establish a prima facie case of retaliation; the burden then shifts to Meharry to articulate a legitimate, nonretaliatory reason for its actions; and then Iyebote must prove that Meharry's reasons were a pretext for its retaliation. See Rogers v. Henry Ford Health Sys., 897 F.3d 763, 772 (6th Cir. 2018) (applying the burden-shifting framework to a retaliation claim).

Iyebote easily establishes a prima facie retaliation case because, at this stage, the record before the Court must be construed favorably to Iyebote. Meharry argues that Iyebote did not engage in protected activity because she "failed to make any complaint about practices protected by the THRA until after she had been dismissed." (Doc. No. 28 at 15). This argument overlooks that Iyebote complained about sexual harassment to Williamson, Akatue, and others prior to her termination. (Doc. No. 39 ¶¶ 61, 63–64). Complaining to supervisors about sexual harassment is "sufficient to satisfy the protected activity prong" of a prima facie retaliation claim. Delozier v. Bradley Cty. Bd. of Educ., 44 F. Supp. 3d 748, 765 (E.D. Tenn. 2014) (citing Johnson v. Univ. of Cincinnati, 215 F.3d 561, 579 (6th Cir. 2000)). When she did so, that placed Meharry on notice of her complaints before the decision was made to terminate her from the residency program. The

14

causation element is satisfied because of the close temporal proximity between her complaint and her termination and because Williamson, who made the termination decision, is at the center of the alleged retaliatory action.

Iyebote has presented sufficient evidence from which an inference could be drawn that she would not have been terminated had she not complained about sexual harassment. George v. Youngstown State Univ., 966 F.3d 446, 459–60 (quoting Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000)). Williamson's central involvement makes such an inference available. Williamson had knowledge of Iyebote's sexual harassment complaints. Williamson failed to engage HR. Williamson then decided to terminate Iyebote. Williamson refused to change her mind notwithstanding the recommendation of the Graduate Medical Education Board. All of this occurred less than six months between her complaints and termination "support[ing] an inference of a causal connection." Id.; see also Sharp v. Aker Plant Servs. Group, 600 F. App'x 337, 341 (6th Cir. 2015). A reasonable juror could therefore conclude that Williamson would not have terminated Iyebote but for her sexual harassment complaints. See George, 966 F.3d at 459–60; see also Wyatt, 999 F.3d at 421; Ennis v. Tenn., 835 F. App'x 811, 824 (6th Cir. 2020). Iyebote has met "the minimal burden of proof necessary at" the prima facie stage for her retaliation claim. Mahar, 2017 WL 6442144, at *36.

The burden next shifts to Meharry to articulate "a legitimate, non-retaliatory reason for the employment action." Michael v. Caterpillar Fin. Servs. Corp., 496 F.3d 584, 596 (6th Cir. 2007). Meharry has clearly done so by adducing evidence of Iyebote's alleged mishandling of a 6404 form and had already been placed on an extended probationary period. (Doc. No. 28 at 16; see also Doc. No. 35 ¶¶ 44–48). Turning to the pretext analysis, there is a genuine dispute of fact on the sufficiency of Meharry's non-retaliatory reason to terminate Iyebote. Williamson changed her

reason for termination, first claiming it was due to Iyebote's overall fitness to be a resident before relying upon her handling of the 6404 form issue resulting in patient harm. (Doc. No. 35 ¶ 44). "An employer's changing rationale for making an adverse employment decision can be evidence of pretext." Eades v. Brookdale Senior Living, Inc., 401 F. App'x 8, 12 (6th Cir. 2010).

Even were Williamson's rationale for termination consistent, there is a genuine dispute as to whether the reason is sufficient or the real reason to justify termination. Chen v. Dow Chem. Co., 580 F.3d 394, 400 (6th Cir. 2009). For example, Iyebote questions whether she in fact mishandled the 6404 form. (Doc. No. 35 ¶ 44; see also Doc. No. 37-1, Iyebote Dep., at 104). Dr. Akatue believes that, even if Iyebote handled the 6404 form incorrectly, she should not have been terminated from the residency program. (Doc. No. 39 ¶ 98; see also Doc. No. 35-10, Akatue Dep., at 54:7–17). Having reviewed the record in the light most favorable to Iyebote, the Court concludes that Iyebote has presented a genuine issue of fact from which a reasonable juror could find that Meharry's proffered rationale for Iyebote's termination was pretext. Mahar, 2017 WL 6442144, at *37.

The Court will deny summary judgment as to Iyebote's retaliation claim under the THRA.

C. Retaliation and Interference Under the FMLA

The FMLA prohibits an employer from retaliating against an employee for taking FMLA leave, see 29 U.S.C. § 2615(a)(2), and from interfering or restraining an employee who exercises her rights under the FMLA. Id. § 2615(a)(1). Courts assess FMLA retaliation and interference claims under the same McDonnell Douglas burden-shifting framework used by the Court above. See Alexander v. Kellogg USA, Inc., 674 F. App'x 496, 501 (6th Cir. 2017); see also Mullendore v. City of Belding, 872 F.3d 322, 327 (6th Cir. 2017).

Analyzing Iyebote's FMLA claim as retaliation or interference, the record establishes that she exercised her rights under the FMLA and soon thereafter she was terminated. Meharry only challenges whether Iyebote can establish causation for her retaliation claim or interference claim. While "but for" causation is required for retaliation, see Sharp v. Profitt, 674 F. App'x 440, 451 (6th Cir. 2016), Iyebote's interference claim only requires evidence that Meharry terminated her "in whole or in part, on the fact that the employee took FMLA-protected leave." Donald v. Sybra, Inc., 667 F.3d 757, 761 (6th Cir. 2012).

The Court finds that Iyebote has done so when the record is viewed in the light most favorable to her. There is very close temporal proximity between Iyebote's March 2019 FMLA leave and Williamson's decision to terminate her on April 29, 2019. This alone permits an inference of retaliation. See Bryson v. Regis Corp., 498 F.3d 561, 571 (6th Cir. 2007) (a three-month period between a request for FMLA leave and termination is sufficient to establish a causal connection). Williamson again was at the center of the termination decision and other actions related to her FMLA leave. Williamson denied Iyebote's FMLA request for a reduced work schedule. (Doc. No. 35 ¶¶ 38–39). Williamson sent a mass email to Iyebote's peers regarding her FMLA leave. (Doc. No. 39 ¶ 87). On April 3, 2019, the day Iyebote returned from FMLA leave, she was placed on a 24-hour work schedule by Williamson. And Williamson disciplined her for tardiness issues that occurred three months prior to her request and approval of FMLA leave. (Id. ¶¶ 90, 92). A reasonable juror could infer a causal connection between Iyebote's termination and her exercise of rights under the FMLA.

Meharry's legitimate, non-retaliatory rationale for terminating Iyebote because she mishandled the 6404 form and put a patient in harm's way again fails on a summary judgment

17

analysis. (Doc. No. 28 at 22). The Court will therefore deny summary judgment to Meharry on Iyebote's FMLA retaliation and interference claims.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE